[Civ. No. 12451. Second Dist., Div. One. Aug. 18, 1941.]

NELLIE J. LAWRENCE, Respondent, v. B. W. TYE et al., Appellants.

H. C. Millsap, Warren E. Libby and Fred G. Conrad for Appellants.

Howard F. Shepherd for Respondent.

DESMOND, J., *pro tem.*—This is an appeal from a judgment entered upon a jury's verdict in a fraud action whereby compensatory damages were awarded against both appellants jointly and exemplary damages in differing amounts against them severally. It is claimed, as the sole ground of appeal,

that the evidence adduced was insufficient to justify the verdict.

 Defendant Tye, at the time of the transactions involved, was engaged in the business of real estate broker, employing a number of salesmen including his codefendant, Parkening. On June 9, 1937, Mrs. Lawrence, plaintiff and respondent, widowed and more than 70 years of age, signed a listing appointing B. W. Tye Co. her exclusive agents for 90 days to sell her property, the Aventine Apartments, for $50,000, subject to a trust deed originally written in the amount of $10,000, but reduced during the year 1937 to $9,400. This listing was secured by defendant Parkening and provided for payment of an agent's commission in the event of sale or exchange. The property was not disposed of in the 90 day period and on September 30, 1937, a second exclusive listing was signed by Mrs. Lawrence similar in all respects to the first, except that the period was fixed at 60 days. After approximately a month had elapsed Mrs. Lawrence wrote the following letter:

"Los Angeles, Calif.
November 2, 1937

"Mr. O. H. Parkening
 "City

"Dear Sir:

"As your firm has had the exclusive listing on The Aventine Apts. for five months and no sale has been made, kindly grant me a release in full—*in writing*—so that I may get busy with others and make disposition, if possible.

"Thanking you for your interest and efforts in my behalf and trusting that we may be able to do some business in the future, I am

"Resp. yours,
" (Mrs.) Nellie J. Lawrence
10518 Wellworth Ave."

Next day Mr. Parkening answered as follows:

"November 3, 1937

"Mrs. Nellie J. Lawrence
 "10518 Wellworth Ave.
 "Los Angeles, California

"Dear Mrs. Lawrence:

"In accordance with your wishes, we hereby release our exclusive listing on your property known as 10541 Wilshire Boulevard.

"We are sorry that we were unable to make a deal for you but we will keep on trying and trust that everything will work out satisfactorily.

"Very truly yours,

"B. W. TYE Co.

"By O. H. PARKENING,

"General Sales Manager"

Thereafter, Mr. Parkening continued to show his interest in Mrs. Lawrence's property, and on one occasion, November 27th, drove her to Riverside County to inspect an orange grove which he had listed for exchange. Respondent declined to trade for that ranch, but expressed some interest in another grove located in Orange County upon which defendants held a listing. This was known, and in this opinion will be referred to, as the Pagel grove, and on the return trip from Riverside County Mrs. Lawrence and Parkening stopped to inspect it. Shortly thereafter, the Tye Co., placed this ranch in escrow, as agent for Mr. Pagel in an exchange for apartment property belonging to a Mrs. Crickelair, and on December 29, 1937, the escrow was closed, about $9,000 cash going to Mrs. Crickelair and title to each parcel passing to the new owner, the grove being subject to a trust deed payable five years from December 23, 1937, in the sum of $8,000. In this deal defendant Tye received $1,500 commission, another broker, L. L. Hullet, receiving the same amount, as Mrs. Crickelair's agent.

Meantime, according to Mr. Parkening's testimony, he and Mrs. Lawrence had discussed, on several occasions, the possibility of her obtaining the Pagel ranch in exchange for her property, but he explained that could not be done "unless we got it into someone's hands other than Nancy Smith Crickelair, because Nancy Smith Crickelair did not want another apartment house." However, Mr. Parkening told Mrs. Lawrence that she could make an offer for the ranch even while it was in escrow and accordingly, on December 20th, prepared, on a letterhead or form of B. W. Tye Co., an exchange agreement whereby Mrs. Lawrence offered, to no one in particular, to exchange the Aventine apartment house for the Pagel orange grove, the lien against each being recited. In this offer, signed by respondent, B. W. Tye Co. was appointed her agent, the closing paragraph reading, "This is a net deal and no commission to be paid by the undersigned." The instru-

ment was witnessed by Parkening acting for B. W. Tye Co., and on a subjoined form of "Acceptance" appear the signatures "F. E. Eades" and "O. H. Parkening," attached, according to the latter, "after Jan. 8, 1938." It is proper to note, however, that the offer to exchange was by its terms to become null and void unless accepted within ten days after its date. F. E. Eades was employed as secretary of the B. W. Tye Co., and in that capacity, being a single woman, frequently acted as dummy in real estate transactions. She was called upon to play that part in the instant case; in fact, two days after her "blind" offer to exchange was made, Mrs. Lawrence on December 22nd signed escrow instructions with Seaboard National Bank in which she undertook to deposit a deed to F. E. Eades of her real property, subject to the $9,400 lien, and a bill of sale to Miss Eades of furniture in two of the apartments therein; F. E. Eades, on her part, agreeing, in the same escrow instructions, to furnish a deed to Mrs. Lawrence of the orange grove, subject to the trust deed for $8,000. The instructions called for internal revenue stamps in the sum of $22 to be attached to each deed, indicating an equity in each parcel of $22,000.

However, the orange grove which Mrs. Cricklelair acquired on December 29th passed almost immediately, by deed dated January 4, 1938, to one Tustin and wife, in exchange for business property in Los Angeles, and, subject to the $8,000 lien, was transferred while in escrow, by deed dated January 8, 1938, from Tustin to Eades, for $14,500, indicating an actual equity in the grove not exceeding that amount, and probably less, since Mr. Tustin received only $12,500, due to payment to Hullet of $1,000 as commission, and the same amount to Tye, either in cash, or in an amount credited on Miss Eades' ostensible purchase of the grove. The grove was passed in escrow to Mrs. Lawrence from Miss Eades, who dated and acknowledged her deed January 8, 1938. This deed, however, was not recorded by the escrow clerk until two weeks later, January 22, 1938. Meantime, title to the Lawrence property which had passed in escrow to Miss Eades was conveyed by her in escrow to O. H. Parkening and wife, by deed of January 3, 1938, five days earlier than January 8th, date of the deed by which Miss Eades acquired from Tustin title to the orange grove, and also date of the deed by which she passed title to the grove to Mrs. Lawrence. Everything being held in escrow, Mrs. Lawrence eventually received

her deed to the grove. During these escrow days, Mr. Parkening filed an application dated January 6, 1938, for a loan of $30,000 on the Aventine Apartments, representing the value of the property as $60,000. Acting upon this application the Prudential Insurance Company granted a loan of $26,000 on the security of a trust deed in that amount, executed by Mr. and Mrs. Parkening upon the Aventine Apartments. The reverse side of the application for this loan under "Report to be made by Representative" presents typewritten answers to various inquiries, including an affirmative to the final query, "Do you fully recommend the approval of this application?" This is followed by the printed statement, "This security herein described has been personally inspected by a representative of this office and the facts as set forth in this application and appraisal are correct." The only signature to this statement is typewritten as follows: "THE THOMAS MORTGAGE CO. by —————————— Vice-President Dated January 10, 1938." Introduced at the trial was a letter written upon stationery of Thomas Mortgage Company of Los Angeles, reading as follows:

"December 28th, 1937

"The Thomas Mortgage Company
 "Los Angeles, California
"Gentlemen:

"In connection with my application for the proposed loan to be placed on property located at 10541 Wilshire Blvd. L. A., California, it is my understanding that the following requirements will be made a part of the loan:

"Conditional assignment of rents.

"First chattel mortgage covering furniture, (if furnished) and fixtures, including electric refrigeration, all of which must be fully paid for.

"Fire insurance with mortgagee clause in favor of the Prudential Insurance Company.

"Occupancy required by the insurance company.
"LK/ (Signed) O. H. PARKENING"

Asked if the signature appearing on this letter were his, Mr. Parkening answered, "Yes, but that letter was signed after January 8." The inquiry then continues, "Q. You mean that it was prepared by the mortgage company prior to that date? A. It perhaps was. There was nothing signed on this deal until after January 8. Q. Had you made some

application to the Thomas Mortgage Company prior to December 28, 1937 with reference to this loan? A. Mr. Tye handled that. I don't know. Q. Then you, personally, did not have any negotiations with the Thomas Mortgage Company as early as December 28, 1937? A. No, sir."

When the letter was shown Mr. Tye he testified as follows: "A. That was signed by Mr. Parkening either after January 8, or on January 8, or after January 8. Q. Now, Mr. Tye, why do you fix the date on or about January 8? A. There was no wheel turned, nothing in the world was done towards acquiring this ranch, towards buying this property, towards getting a loan, towards anything, until Mrs. Lawrence signed that statement. That's why I can fix it positively. Q. Mr. Tye, were you present when Mr. Parkening signed these documents? A. Yes, sir. Q. Mr. Tye, when did you first know of the Lawrence property, this exchange of the Aventine Apartment for the Pagel Ranch; when did you first know of it, not when it was made, but when did you first know about it. A. Sometime the latter part of December. Q. 1937? A. 1937. Q. When was the first time it was suggested to you that you individually put up money for this property; do you have any recollection of that? A. I think it was sometime right around January 6. Q. Did you know of the Lawrence escrow of December 22, at the bank being open at the time it was opened? A. Oh, I would say, I guess, that I did. I know in a general way about what is going on in the office."

The statement which Mrs. Lawrence signed, referred to in this testimony, is as follows:

"Los Angeles, Calif. January 8, 1938

"Mr. B. W. Tye

"5050 Wilshire Boulevard

"Los Angeles, California

"Dear Sir:

"With reference to the exchange of properties, between myself as First Party and F. E. Eades, as Second Party, being handled through Escrow No. 2472, at the Wilshire Dunsmuir Branch of the Bank of America, N. T. & S. A., wherein, the property being conveyed by me is described as Parcel I (Legal description of Aventine Apartment property), and the property being acquired by me is described as Parcel II (legal description of Pagel orange grove), this is to approve, and

affirm, that in said transaction I am not paying you a commission, and you are not acting as broker or agent, but that you are acting as a principal, and that the above-mentioned property described as Parcel I is being conveyed by me to, and acquired by, you or your nominee, as such principal, and that any and all profit, that may be derived by you or your nominee from said property through the sale, resale or exchange thereof, or otherwise, is to be retained by you, or your nominee, and I have no title or interest therein.

"Further, as to the property being acquired by me in said exchange, and referred to above as Parcel II, I have inspected said property, and have satisfied myself as to the value and condition thereof, and am making this exchange of properties entirely on my own inspection, and no warranty or representation as to the value or condition of said Parcel II, or otherwise, has been made to me by yourself, or your nominee, or your agents.

"(Signed) NELLIE J. LAWRENCE."

On January 21, 1938, Mr. and Mrs. Parkening signed the trust deed in favor of the Prudential Insurance Company, approval of the loan being received on that day, and on the same date Tye put in escrow his check for $13,536, a sufficient amount, allowing for his $1,000 commission, to acquire the grove from Tustin. Within a few days thereafter there was available in the escrow the sum of $16,117.73 in the form of a check payable to Mr. and Mrs. Parkening, proceeds of the $26,000 loan after payment of the prior loan of $9,400 and expenses. This check the payees endorsed to Mr. Tye. It will be seen, therefore, that in effect the increased loan on the Aventine Apartments, Mrs. Lawrence's property, provided the money to buy the Pagel ranch from Tustin. If the deal had been negotiated by respondent personally she might have had title after it was closed to the two parcels, one subject to a lien of $8,000, the other to a lien of $26,000, with a substantial equity above that amount, as appears from the fact that Mr. Parkening sold the Aventine Apartments within a month after the escrow closed, for $10,000 cash above the encumbrance. The profit on the transaction he and Mr. Tye divided equally. This is the profit which Mrs. Lawrence, in her letter of January 8th, stated was to be retained by Mr. Tye, on the theory, expressed in that letter, that he was acting not as broker or agent, but as a

principal. But when, several months later, Mrs. Lawrence learned what had transpired, she promptly served a notice of rescission of the agreement of January 8th upon appellants, "on the ground that the consent of the undersigned to the execution and the making of the said agreement and such other agreements, was obtained by fraud and false representations, by fraudulent concealments, or by undue influence exercised upon the undersigned, and the undersigned hereby offers to return anything of value which she may have received in connection with the making and entering into of such purported agreements and consents."

Appellants did not accept the offer made by respondent in this notice, the present suit was brought and a jury assessed plaintiff's compensatory damages in the sum of $13,500, adding exemplary damages against appellant Tye in the sum of $500; against appellant Parkening in the sum of $250.

Appellant Tye states in his brief that "as a result of said exchange, loan and sale a profit of $10,013.32 was made." The expense account has not been tabulated, but respondent calls our attention to the gross profit as being the sum of $13,100. It would seem that the orange grove was actually worth not more than $22,500, the sum of the $8,000 lien, plus the amount of cash which Tustin received, namely, $14,500. By the same system of reckoning the Aventine Apartment building was worth $36,000, the sum of the new loan, $26,000, plus the cash for which the equity was sold, $10,000. The difference between the two figures, $36,000 and $22,500, equals $13,500, the amount of the jury's verdict.

Appellants contend that the verdict was not justified by the evidence, in that the relation of principal and agent having been dissolved, Messrs. Tye and Parkening were thereafter relieved of any fiduciary relationship to Mrs. Lawrence. It will have been noticed that both appellants in their testimony referred with particularity to January 8, 1938, as an important date in their dealings with respondent and her property. They seem to believe, judging from their respective briefs, that because on that date respondent signed the statement which that morning Mr. Tye dictated in the escrow office, recognizing him as a principal and entitled to retain any profit which he might make from the transaction, that matters which transpired at an earlier date have no bearing upon the issues of this case. At the same time considerable

effort is made to show that as a matter of fact the agency between the parties expired before January 8th, to-wit, on November 3, 1937, the date of Mr. Parkening's letter to Mrs. Lawrence. But, in that letter, he said "We are sorry that we were unable to make a deal for you, but we will keep on trying." We have alluded to the effort made in late November by appellant Parkening to effect an exchange between Mrs. Lawrence and the owner of the Riverside ranch and the jury heard testimony from a Mrs. Conrad, employed by Mr. Tye as a saleswoman, upon a commission basis, that she was placed by defendants as a "hostess" in the Aventine Apartments August 2, 1937, and remained there in that capacity continuously every day until December 7th, when she left to accept another position. Mrs. Conrad stated that during that period she telephoned the office of B. W. Tye Co., the names of any "prospects" inspecting the apartments. It appeared also that a "For Sale" sign of the Tye Co., remained on the Aventine Apartments during all the time Mrs. Conrad was there. The jury also heard and may have credited Mrs. Conrad's testimony that about two weeks before she quit she had a conversation with Mr. Parkening in the office in which she "told him that Mrs. Lawrence was getting discouraged and disgusted with the property and he said that would be perfectly all right, because if she got disgusted enough, why, they could get it at their own price."

In addition to the matters already mentioned the jury may have noticed that Parkening prepared the offer of December 20th which Mrs. Lawrence signed appointing B. W. Tye Co., "my agents irrevocably within the time limited . . . to negotiate an acceptance," etc., even though no commission was to be paid by the terms of that offer. The jurors were aware that this offer was followed in two days by an escrow agreement also providing for no commission. They knew also that Mr. Tye prepared the letter dated December 28th signed by Mr. Parkening and addressed to Thomas Mortgage Co., concerning the loan which was approved in January by the Prudential Insurance Co. They were aware from Mr. Tye's own admissions that he first knew about the proposed exchange of the Lawrence property for the Pagel ranch in the latter part of December, and that he knew of the Lawrence escrow of December 22nd when it was opened.

With all these and a number of other facts in mind it is obvious that the jurors declined to accept the statement of Mr. Parkening that "There was nothing signed on this deal until after January 8th," or the assurance of Mr. Tye that "There was no wheel turned, nothing in the world was done towards acquiring this ranch, towards getting a loan, towards anything, until Mrs. Lawrence signed that statement."

The complaint in this case charged:

"That the plaintiff's consent to permit the defendants B. W. Tye and O. H. Parkening to withdraw as her agents, to act as principals in the exchange and to the said agreement of exchange, to the execution of said escrow instructions and to the delivery of the deed to her apartment property to said F. E. Eades, was obtained by fraud in that the defendants made false representations and fraudulently concealed matters in and during the negotiations leading up to the execution of the several instruments and agreements above mentioned and the closing of said third escrow, particularly as follows:

"1. Represented that plaintiff's apartment property was unsaleable and an undesirable property; that same had no fair market value in excess of $28,000.00;

"2. Represented that the orange ranch on December 20th, 1937, was fairly worth the sum of $30,000.00. . . .

"7. Represented that no mortgage company would loan any more on plaintiff's apartment property than the loan of $9,400.00 which was then a lien thereon;

"8. Represented that the defendant B. W. Tye was paying $28,000.00 for the orange ranch;

"9. Represented that if the plaintiff would take the ranch the defendants B. W. Tye and O. H. Parkening would put the Nancy Crickelair ranch trade deal through, make a commission on said transaction, that such commission represented their total profit in the whole transaction;

"10. Represented to plaintiff that B. W. Tye was acting as principal in the transaction, but explained to plaintiff that the reason B. W. Tye was a principal was that he was not charging the plaintiff any commission in the proposed exchange.

"Concealed from the plaintiff what plaintiff alleges to be the true facts respecting the exchange transaction, to-wit:

"(a) That at some time during the period from August 1st, 1937, to December 1st, 1937, the defendants Tye and O. H. Parkening planned to obtain for themselves the above mentioned apartment property. . . .

"(c) That the defendants had knowledge prior to December 20th, 1937, that the orange ranch could be purchased subject to said $8,000.00 trust deed, for the sum of $14,500.00; that on December 20th, 1937, when the defendants procured from the plaintiff said offer to exchange her apartment house property for the said orange ranch, the defendants planned to themselves acquire the orange ranch and exchange the same to the plaintiff for her said apartment property; that at the same time the defendants planned to procure a loan upon the plaintiff's apartment property to pay the purchase price of $14,500.00 for the said orange ranch, and to appropriate to themselves any excess moneys from said loan over and above the amount necessary to pay for the said ranch, that they knew that with reasonable efforts plaintiff's apartment property could be sold for a price to net the defendants in excess of $10,000.00 over and above the cost to them of said orange ranch;

"(d) That as early as January 4th, 1938, the defendants had made and entered into an agreement with said R. T. Tustin, Jr., and Nancy Crickelair, by the terms of which it was provided that they could acquire the said orange ranch at a purchase price of $14,500.00. . . . "

It will be noticed that all the transactions thus complained of took place prior to January 8th, and we must conclude from the jurors' verdict that they decided that appellants conspired while agents of respondent and before January 8th to obtain her property at a low price to their own advantage, and to her proportionate disadvantage; further, that in reaching this decision they found that false representations as to values and fraudulent concealment of facts which defendants in good faith were bound to disclose to their principal enabled them to accomplish their purpose. Having all the evidence in mind, particularly that relating to the opening of the escrow of December 22nd, the obtaining of the loan of $26,000, and the sale of the Aventine Apartments for $36,000 at a profit of $10,000 within a few weeks thereafter, we see no reason for disturbing the verdict. The rules defining an agent's responsibility to his principal are closely

akin to those binding upon a trustee toward his beneficiary and are briefly stated in our Civil Code. An exhaustive discussion of the subject appears in 1 Cal. Jur. in the article on "Agency," subdivision VI thereof. Sections 82 and 85 are of special interest. ▮ In a footnote to section 87 authorities are cited for the following statement. "To validate an agent's purchase from his principal, the agent must show that he acted in perfect good faith, revealed all material facts and paid an adequate consideration. The agent must conceal no facts within his knowledge which might influence the judgment of his principal as to the price or value and if he does the sale will be set aside."

▮ The jury in this case may have found, on the evidence, a failure upon the part of appellants to meet all or any of the requirements necessary to validate the exchange to Parkening; and since Tye participated equally with him in the profits of the transaction and acted personally in connection with it he is jointly liable in compensatory damages. The difference in the amounts assessed against the defendants respectively as exemplary damage may be accounted for by the difference in their wealth as shown by the evidence.

Judgment affirmed.

Doran, Acting P. J., and White, J., concurred.